IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

CIVIL NO. 1:05CV91

| | |
|---|---|
| JOYCE RIGGS, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| Vs. ) | <u>MEMORANDUM AND ORDER</u> |
| ) | |
| DAYCO PRODUCTS, INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**THIS MATTER** is before the Court on the Plaintiffs' motion for a preliminary injunction which is opposed by the Defendants.

**I. PROCEDURAL HISTORY**

On April 25, 2005, the Plaintiffs initiated this action pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq.,* and the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. § 185, *et seq.* Plaintiffs allege three causes of action: a breach of the collective bargaining agreement, in violation of the LMRA; a breach of ERISA obligations; and a breach of fiduciary obligations in violation of ERISA. On May 3, 2005, the undersigned entered a temporary restraining order to maintain the status quo.

By jury verdict returned August 3, 2004, in the companion case of *Trull v. Dayco Products, LLC*, Civil Case No. 1:02cv243, it was determined that the members of Subclass B of that class action are entitled to vested, lifetime medical benefits at the level of benefits in

existence at the dates of retirement subject to annual insurance premium caps.  **Jury Verdict, filed August 3, 2004.**  The members of Subclass B in that action are also the members of the proposed class in this new lawsuit.  The jury also determined the amount of the annual cap above which the retirees are obligated to make payment for their insurance premiums.  There was no issue presented in that companion case involving family insurance coverage, which is the issue in this litigation.  **Plaintiffs' Motion for Preliminary Injunction and for Temporary Restraining Order ["Plaintiffs' Motion"], filed April 25, 2005, at 7 ("At the time of both the jury and bench trials conducted in Civil Case No. 1:02CV243, Defendant Mark IV had not attempted or threatened to change the way that it applies the cap to premiums for family coverage.  Accordingly, no issue was presented to, or decided by, the jury or the Court on that point.").**

## II.  STANDARD OF REVIEW

> The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits.  Indeed, the maintenance of the status quo is justified only insofar as it aids the court in granting final relief.  Therefore, a preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally, but conversely, preliminary relief may never be granted that addresses matters which in no circumstances can be dealt with in any final injunction that may be entered.
> . . .
> In sum, preliminary injunctions are extraordinary interlocutory remedies that are granted in limited circumstances and then only sparingly.  The limited circumstances amount to the demonstration of a need to protect the status quo and to prevent irreparable harm during the pendency of the litigation to preserve the court's ability in the end to render a meaningful judgment on the merits.  If that need is not presented, then a preliminary injunction should not be considered.  But if the need is demonstrated, then the entry of a preliminary injunction rests in the

> discretion of the district court, which is informed by balancing factors under an analysis conducted pursuant to the familiar four-part test described in *Blackwelder* [*Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189 (4th Cir. 1977)]. Under this test
>> a court should consider (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the injunction is granted; (3) the likelihood that plaintiff will succeed on the merits; and (4)the public interest.
>
> . . .
>
> In applying this four-factor test, the irreparable harm to the plaintiff and the harm to the defendant are the two most important factors. Emphasis on the balance of these first two factors results in a sliding scale that demands less of a showing of likelihood of success on the merits when the balance of hardships weighs strongly in favor of the plaintiff, and vice versa.

***In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525-26 (4th Cir. 2003) (quoting *Safety-Kleen, Inc. v. Wyche*, 274 F.3d 846, 858-59 (4th Cir. 2001) (other internal quotations and citations omitted); *accord, East Tennessee Natural Gas Co. v. Sage*, 361 F.3d 808, 828 (4th Cir.), *cert. denied*, 125 S. Ct. 478, 479 (2004).** The "balance of hardship" test does not relieve the moving party from making a "clear showing of irreparable harm," that is, harm which is "neither remote nor speculative, but actual and imminent." ***Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 812 (4th Cir. 1991).** But, if the Plaintiffs do make such a showing, the next step requires a balancing of the likelihood of this harm to the Plaintiffs resulting from a failure to grant interim relief against the likelihood of harm to the Defendants as a result of the interim relief. *Id.* Only after this evaluation is completed will the Court consider the likelihood of success on the merits. *Id.*

As noted, a temporary restraining order issued on May 3, 2005, which provided the Defendants with an opportunity to respond to the motion for a preliminary injunction. In addition, the Court asked the Defendants to state whether, in their opinions, a hearing on the motion would be required. Defendants responded that it would be an abuse of discretion to rule

on a motion for a preliminary injunction without a hearing because there is an inadequate factual record before the Court. Defendants noted that "the factual record is clearly 'inadequate' for purposes of granting a preliminary injunction; this is true not only because the Plaintiffs' affidavits are deficient on their face, but also because the facts asserted in the complaint are disputed and are inconsistent with the record that has already been established in [the companion case]." **Defendants' Response to Plaintiffs' Motion for Preliminary Injunction and for Temporary Restraining Order ["Defendants' Response"], filed May 13, 2005, at 18.**

> [T]he purpose of Rule 65's notice requirement is to provide the party opposing the preliminary injunction with a fair opportunity to oppose the application and to prepare for such opposition. So long as these goals are met, Rule 65 does not require an evidentiary hearing. Indeed, if the [Defendants] were correct, no preliminary injunction could ever issue without an evidentiary hearing. This is plainly wrong. . . . Where the injunction turns on the resolution of bitterly disputed facts, . . . an evidentiary hearing is normally required to decide credibility issues.
>
> . . .
>
> [However,] where material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought, district courts generally need not hold an evidentiary hearing.

*McDonald's Corp. v. Robertson*, **147 F.3d 1301, 1311, 1313 (11th Cir. 1998) (internal quotations and citations omitted).** Likewise, where the facts have been demonstrated at prior stages of the case, a hearing is not required. *Charette v. Town of Oyster Bay*, **159 F.3d 749, 755 (2d Cir. 1998).** Here, not only is there a record from the companion case but the Defendants have relied on that record in responding to this motion. Moreover, a hearing is not required "when the disputed facts are amenable to complete resolution on a paper record." *Id.*; *accord, Moore v. Consolidated Edison Co. of New York*, **__ F.3d __, 2005 WL 1301277, *4 (2d Cir. 2005);** *Eisenberg v. Montgomery County Pub. Sch.*, **197 F.3d 123, 134 (4th Cir. 1999).** There

is an extensive paper record before the Court both on this motion and in the companion case of which the Court may take judicial notice. For the reasons stated herein, the Court finds resolution of this motion may properly occur without an evidentiary hearing.

### III. FACTUAL ALLEGATIONS

It is clear from the trial of the companion case that Dayco Products, LLC (Dayco) operated a manufacturing facility in Waynesville, North Carolina, until 1998 at which time the plant was closed. The hourly employees of Dayco were members of Local 277, United Steelworkers of America, AFL-CIO-CLC (Local 277) which negotiated collective bargaining agreements for the employees. On May 1, 1995, Local 277 and Dayco entered into a Group Benefits Agreement which addressed the right of retired employees to medical insurance coverage. In the companion case, a jury verdict established the following: (1) members of Local 277 who retired after July 30, 1995, and their surviving spouses, are contractually entitled to vested, lifetime, medical benefits at the level of benefits in existence at the dates of retirement; (2) those members are subject to annual insurance premium caps in the amounts of $3,500 for pre-65 retirees and $1,900 for post-65 retirees;[1] and (3) the Defendants did not breach the contracts by notifying these retirees they would be required and/or by requiring them to contribute to the payment of their health insurance premiums over and above the caps which had been or are paid by Dayco.

---

[1] In other words, Dayco was obligated to pay no more than these amounts for each individual retiree. The retiree was responsible for paying any additional costs for the insurance over and above the cap.

Mark IV Industries, Inc., which acquired Dayco in 1988, and Subsidiaries Group Welfare Benefit Program (collectively "Mark IV") continue to administer the retirement benefits for these retirees. The parties do not dispute that the 1995 agreement contained a provision that individual retirees would have no cost for medical insurance as long as the cost of coverage under the plan did not exceed the caps listed above.[2] Nor do they dispute that Dayco/Mark IV unilaterally determined how much it would pay toward the cost of insurance for family coverage, as opposed to coverage for the retiree only. Defendants paid 3.5 times the cost of an individual employee's health insurance toward the cost of a family plan. The parties also do not dispute that the language of the collective bargaining agreement is silent on this issue.

On April 8, 2005, Mark IV sent letters to the retirees which contained the following:

As you may know, a decision reached by jury trial last year resulted in the validation of the annual cost caps on retiree medical that were established under the 1995 Agreement between Mark IV and Local 277 of the United Steelworkers of America.[3]

. . .

*Under your present coverage*, Mark IV *has allowed a cap amount for family coverage equal to approximately 3.5 times the single coverage cap amounts.* This resulted in covered retirees not being charged for the cost of the benefit until the cost exceeded 3.5 times the cap. Effective May 1, 2005, *Mark IV will revise the way it applies the cap and will adhere to the terms of the Agreement that specifically outlines that you are only entitled to a total cap* of either $3,500 if you are not eligible for Medicare or $1,900 if you are Medicare-eligible. You may

---

[2] In response to the motion, Mark IV argued that "[a]fter the contract expired, the Company continued to provide health insurance benefits to the Plaintiffs, but did so voluntarily and only up to the level of the cost caps." **Defendants' Response, at 3.** The jury verdict in the companion case, however, established that the company is contractually obligated to provide such benefits. That finding constitutes *res judicata* and thus, there is no factual dispute.

[3] Since Mark IV has taken the position that the jury verdict establishes their contractual obligation, it is frivolous for the Defendants to argue in their response that they were not contractually obligated but merely "voluntarily" made such payments.

still cover an eligible spouse or dependent child under family coverage, *but the total cap for which you are eligible* is $3,500 or $1,900.

**Exhibit 1,** *attached to* **Plaintiffs' Motion (emphasis and footnote added).** In other words, any cost of the insurance premium for family coverage over and above those amounts had to be paid by the retiree; whereas previously, Dayco had paid $12,250 toward the family coverage health insurance premiums of a retiree not yet eligible for Medicare (3.5 x $3,500) and $6,650 toward the premiums of a retiree eligible for Medicare (3.5 x $1,900). This meant that the retiree's yearly insurance premiums for a family plan increased by $8,750 for a retiree not yet eligible for Medicare and by $4,750 for a retiree eligible for Medicare. Retirees were advised in the letters that within one month they would be expected to pay the difference on a monthly basis. *Id.*

Evidence during the trial of the companion case established that the union members working at Dayco chose to have lower pension payments in return for Dayco's promise to provide lifetime health insurance for retirees and their spouses. Plaintiffs have attached affidavits from retirees attesting to the same. For example, Roderick Rogers draws a total pension from Dayco of $253.22 per month. **Exhibit 2, Declaration of Roderick Rogers,** *attached to* **Plaintiffs' Motion.** His total household income is $1,900; however, Mark IV has advised him that he must contribute $1,153.70 per month toward his family health insurance coverage. *Id.* As a result, Rogers and his wife elected to allow their coverage to lapse. *Id.*

Roy McMahan receives $570.50 per month as a pension from Dayco. **Exhibit 3, Declaration of Roy Thomas McMahan,** *attached to* **Plaintiffs' Motion.** The only source of income for his household is social security in the amount of $1,860 per month. *Id.* He was informed in April 2005 by Mark IV that his insurance premiums for family coverage would

increase for a total payment of $1,193.14 per month.  *Id.*  Previously, he was paying $463.98 per month for the same coverage.  *Id.*  Both Roy and his wife are disabled and, as a result of their pre-existing conditions, they would be unable to obtain other insurance.  *Id.*

While the litigation of the companion case progressed, Dayco agreed not to seek payment of the insurance premiums which exceeded the annual caps.  That agreement continued from January 1, 2002, through September 30, 2003.  Beginning in October 2003, the agreement terminated and some retirees began to make payments to Dayco of those insurance premiums which exceeded the annual caps.  However, the parties entered into a stipulated order in December 2004 pursuant to which Dayco agreed not to enforce collection of the deferred premiums for the 21-month period until May 2005.  With the May 2005 deadline approaching, Mark IV sent letters to the retirees notifying them of the total amount of deferred premiums subject to collection.  **Exhibits 4 and 5, Declarations of Wiley Parker and James Leatherwood,** *attached to* **Plaintiffs' Motion.**  In notifying these retirees of the amounts of deferred family premiums now to be collected, Mark IV calculated the amount to be collected by applying the 3.5 ratio instead of the annual per retiree cap.  *Id.*

Mark IV has claimed through the affidavit of Michelle Aquilina, Corporate Human Resources manager for Mark IV, that "the cost to the plan of not correcting the cap methodology is approximately $98,466 per month."  **Exhibit G, Declaration of Michelle Aquilina,** *attached to* **Defendants' Response, ¶ 16.**  She also averred that while this cost is "to the plan," the medical benefits and insurance premiums are paid from Mark IV's operating budget rather than from any fund.  *Id.*, **¶ 17.**  The discrepancy between these two averments is not clarified.

## IV. DISCUSSION

The Court first considers the balance of harm between the parties. Defendants argue that "this is nothing more than a money damages case in which Plaintiffs are claiming that they are being 'overcharged' for their insurance." **Defendants' Response, at 13.** Plaintiffs, however, have presented affidavits showing that retirees will be forced to drop their insurance coverage due to the significant increase in premium costs. Moreover, based on other affidavits presented, those retirees will not be able to obtain replacement insurance due to their ages and medical conditions.

This case falls squarely within the facts of *LaForest v. Former Clean Air Holding Co., Inc.*, 376 F.3d 48 (2d Cir. 2004), a case with which defense counsel ought to be familiar but which was not cited or referenced in any manner in their brief. In *LaForest*, Bendix Corporation (Bendix) divested itself of three unionized manufacturing plants by selling them to a newly created company, Facet Enterprises, Inc. (Facet). Much as in the case at hand, Bendix entered into an agreement with the union "by which it promised, in essence, that certain retirees, . . . and surviving spouses would retain – for life – the level of health benefits in place at Bendix on April 1, 1976." *Id.*, **at 50.** In 2002, the successor corporation of Facet reduced retiree benefit levels below those in place under the agreement and the lawsuit ensued. Mark IV appeared in that action as a third-party defendant due to its position as a successor in interest of Facet and it was represented in that action by John Allen and Joseph Vogan, who now represent Mark IV in this action. Defense counsel, then, must be aware that the district court in that case granted a preliminary injunction based on a finding that failure to provide health benefits to the retirees in the levels set forth in the agreement constituted irreparable harm and the Second Circuit affirmed

that finding. Nonetheless, there is absolutely no mention of the case in their brief, although citations are made to district court decisions. Yet, the Second Circuit, quoting the First Circuit, noted that

> general facts that either are commonly believed or which courts have specifically held sufficient to show irreparable harm [include] such general facts as (1) most retired union members are not rich, (2) most live on fixed incomes, (3) many will get sick and need medical care, (4) medical care is expensive, (5) medical insurance is, therefore, a necessity, and (6) some retired workers may find it difficult to obtain medical insurance on their own while others can pay for it only out of money that they need for other necessities of life.
> . . .
> So long as plaintiffs demonstrate[] injury non-compensable in terms of money damages, they have demonstrated irreparable injury.

***LaForest, supra*, at 55-56 (quoting *United Steelworkers of America v. Textron, Inc.*, 836 F.2d 6, 8 (1st Cir. 1987)) (other quotations omitted).**

In the affidavits submitted in support of the motion for a preliminary injunction, the retirees have averred that they live on a low, fixed income, have serious medical needs, such as multiple drug prescriptions and disabilities, agreed to a lower pension in order to have the guarantee of medical insurance, and in the event they lose their insurance, would be unable to replace it both due to pre-existing conditions and outrageously high premiums.[4] "It is hard to imagine a greater harm than losing a chance for potentially life-saving medical treatment." *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 961 (8th Cir. 1995); *accord, Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653, 657 (6th Cir. 1996); *Mowbray v. Kozlowski*, 725 F. Supp.

---

[4]**The Court finds these affidavits representative of the situation of each member of the proposed class. Testimony from the companion case adequately established that these individuals face a serious risk of losing medical care and prescription drugs as a result of losing their insurance. *See, e.g., Yolton v. El Paso Tennessee Pipeline Co.*, 318 F.Supp.2d 455, 472 (E.D. Mich. 2003).**

**888 (W.D. Va. 1989).** The undersigned concludes that the Plaintiffs have shown irreparable harm.

By contrast with the benefits which the retirees stand to lose, Mark IV estimates the "cost" of not "correcting" the premium calculation is about $98,000 per month. Yet, Mark IV has carried this monthly "cost" since 1998 when the plant closed and it has consistently calculated the health insurance premiums using the 3.5 ratio since that date.

> In applying th[e] four-factor test, "[t]he irreparable harm to the plaintiff and the harm to the defendant are the two most important factors." Emphasis on the balance of these first two factors results in a sliding scale that demands less of a showing of likelihood of success on the merits when the balance of hardships weighs strongly in favor of the plaintiff, and vice versa. . . . "If, after balancing [the first] two factors, the balance tips decidedly in favor of the plaintiff, a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation."

*In re Microsoft*, 333 F.3d at 526 (quoting *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir. 1991)). The Court finds that the balance tips decidedly in favor of the Plaintiffs. It is most telling that Mark IV admits that it set the 3.5 ratio and applied it for an almost 10-year period before deciding that it would strictly follow the per retiree cap.

As to the likelihood of success, Defendants note that "the jury found that the Company has the right to charge for any amounts in excess of the caps. Thus, by revising the cap methodology, the Company has simply brought the plan into compliance with the contract and the plan documents, as determined by the jury." **Defendants' Response, at 14.** This argument overlooks what both parties admit: there was no issue or evidence presented to the jury concerning family insurance coverage. And, Mark IV admits that in complying with the final

agreement between the parties, Dayco paid 3.5 times the individual cap toward family coverage and continued this custom and practice until May 2005.

At issue in this lawsuit will be whether the parties agreed to family coverage, and, if so, in what amount. We are, therefore, back to the beginning; that is, contract interpretation.[5]

At issue is

> the much-litigated issue of when a right to health benefits that is granted to retired workers by a collective bargaining agreement [] survives the termination of the agreement. The issue must be decided as a matter of federal common law developed under the authority of section 301 of the Taft-Hartley Act, 29 U.S.C. sec. 185, as interpreted in *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456-57 [] (1957)[.][6]

***Rossetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 541 (7th Cir. 2000) (footnote added) (internal citations omitted).** Or, as the Fourth Circuit has stated,

> While the question therefore is primarily one of contract interpretation, collective bargaining agreements are not interpreted under traditional rules of contract but under a federal common law of labor policy. Therefore, in order to interpret such an agreement, it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements. Of course, as with any contract interpretation, we begin by looking at the language of the agreement for any clear manifestation of the parties'

---

[5]Defendants argue the companion case constitutes *res judicata* because the Plaintiffs should have raised this issue in that action. However, throughout the entire course of the companion case, Mark IV never modified its custom of paying 3.5 times the individual retiree cap toward family insurance coverage. The first time any indication of that occurred was in April 2005, over seven months after the final jury verdict. In short, until that occurred, there was no case or controversy on that issue.

[6]Although it appears that a more stringent standard is applied to determine whether benefits "vest" under ERISA as opposed to the LMRA, the undersigned does not distinguish between the two for the purposes of this decision. The Plaintiffs have established a likelihood of success as to the LMRA claim sufficient to warrant issuing the preliminary injunction. ***See, Keffer v. H. K. Porter Company, Inc.*, 872 F.2d 60 (4th Cir. 1989) (LMRA); *Gable v. Sweetheart Cup Co., Inc.*, 35 F.3d 851 (4th Cir. 1994) (ERISA).**

intent. The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion.

***Keffer v. H. K. Porter Co., Inc.*, 872 F.2d 60, 62 (4th Cir. 1989) (internal quotations omitted).**

In the context of a collective bargaining agreement ("CBA"),

> [c]ourts can find that rights have vested under a CBA even if the intent to vest has not been explicitly set out in the agreement. CBAs may contain implied terms, and the parties' practice, usage, and custom can be considered. Retiree benefits are "in a sense 'status' benefits which, as such, carry with them an inference . . . that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." This is because "[b]enefits for retirees are only permissive not mandatory subjects of collective bargaining. As such, it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations."

***Maurer v. Joy Tech., Inc.*, 212 F.3d 907, 915 (6th Cir. 2000) (quoting *UAW v. BVR Liquidating, Inc.,* 190 F.3d 768, 772 (6th Cir. 1999) and *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 (6th Cir. 1983)).**

As to the 1995 contract, "someone who read the contract without knowledge of its real-world context of application would think it clear." **Rossetto, 217 F.3d at 543.** However, as applied to this particular dispute, the 1995 agreement contains a latent ambiguity. ***Id.*** While there is a reference to caps for the individual retiree, the agreement clearly provides for insurance for the retiree's spouse, thus implicating the issue of family coverage and Dayco's custom of paying 3.5 times the individual cap. The undersigned previously found the agreement ambiguous and reiterates that ruling here. ***Trull v. Dayco Products, LLC*, 329 F.Supp.2d 658 (W.D.N.C. 2004).**

> If there is language in the [collective bargaining] agreement to suggest a grant of lifetime benefits, and the suggestion is not negated by the agreement read as a whole, the plaintiff is entitled to a trial. Of course, if the agreement expressly

grants such benefits, the plaintiff is entitled, not to a trial, but to a judgment in his favor. . . . If the plaintiff is entitled to a trial by reason of either a patent or a latent ambiguity, the normal rules of evidence will govern the trial, and so the parties will not be limited at trial to presenting *objective* evidence of meaning.

**Rossetto**, **217 F.3d at 547.** Thus, at the trial of this action, evidence relating to the custom of paying 3.5 times the individual cap may be received.

In addition to the claim for breach of contract pursuant to the LMRA, the Plaintiffs have alleged that the Defendants breached their fiduciary duty under ERISA to negotiate the best possible premiums for insurance. The Court finds the Plaintiffs have raised questions going to the merits sufficiently substantial to make them fair ground for litigation. As a result, they have established a likelihood of success.

The public interest is served by protecting the integrity of plan and maintaining the status quo. **Gerardi v. Pelullo**, **16 F.3d 1363 (3d Cir. 1994).**

> ERISA provides a policy "to protect the interests of participants in employee benefit plans . . . by providing for appropriate remedies, sanction, and ready access to the Federal Court." The LMRA favors enforcement of CBAs so as to protect the contractual rights of employees and employers. [T]he public interest favors issuance of an injunction as ERISA and the LMRA strongly favor the protection of rights guaranteed employees by welfare benefit plans[.]

**Yolton**, **318 F.Supp.2d at 473 (quoting 28 U.S.C. § 1001(b)).** The public interest is served in protecting the legitimate expectations of retirees in their insurance. **Fox v. Massey-Ferguson, Inc.**, **172 F.R.D. 653, 680 (E.D. Mich. 1995),** *aff'd*, **91 F.3d 143 (table), 1996 WL 382272 (6th Cir. 1996).** The Court, therefore, finds that the public interest is served by granting the preliminary injunction.

The Court further finds the bond previously posted is sufficient.

## V. ORDER

**IT IS, THEREFORE, ORDERED** as follows:

1. the proposed class is defined as all persons: (a) who retired from the Local 277 bargaining unit on or after May 1, 1995, having met the eligibility requirements for retiree medical insurance; (b) who declined any available option to be treated as a "pre-Addendum" retiree, and instead chose to receive coverage under the plan of retiree medical insurance benefits promised in the 1995 Benefits Agreement; and (c) who have one or more dependents eligible for coverage pursuant to the terms of the 1995 Benefits Agreement;

2. the Defendants are enjoined from terminating the medical coverage of any member of the proposed class for the failure to pay any premium amount higher than the premiums in effect on April 1, 2005, pending the outcome of this action;

3. the Defendants are enjoined from taking any other action to collect a premium from members of the class in an amount higher than the premiums in effect on April 1, 2005, pending the outcome of this action;

4. the Defendants have previously been enjoined from collecting deferred premiums and are hereby enjoined from the same in this action as well;

5. the parties shall advise the Court on or before 15 days from entry of this Order by pleading not to exceed five pages in length whether it is possible to reinstate insurance for members of the class as to whom coverage has been terminated.

**Signed: June 16, 2005**

Lacy H. Thornburg
United States District Judge